## GOAT *v.* UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 405.    Argued October 12, 13, 1911.—Decided April 29, 1912.

*Heckman* v. *United States, ante,* p. 413, followed to effect that the United States has capacity to maintain a suit in equity to set aside conveyances of allotted lands made by allottee Indians in violation of statutory restrictions.

The question in this case is: What are the restrictions in the case of allotments to Seminole freedmen?

The relations of the United States to Seminole freedmen by treaties and statutes reviewed, and *held* that the United States is entitled to maintain an action to set aside all conveyances made by Seminole freedmen of homestead lands, of surplus lands made by minor allottees, and by adult allottees if made prior to April 21, 1904; but that such an action cannot be maintained as to conveyances made by adult allottees after April 21, 1904.

179 Fed. Rep. 13, modified and affirmed as to this point.

THE facts, which involve the validity of certain conveyances of allotted lands made by Seminole Indians and also the right of the United States to have such conveyances set aside, are stated in the opinion.

*Mr. J. C. Stone, Mr. Robert J. Boone* and *Mr. S. T. Bledsoe,* with whom *Mr. Geo. C. Crump, Mr. H. H. Rogers, Mr. J. H. Maxey, Mr. J. H. Miley* and *Mr. B. B. Blakeney* were on the brief, for appellants.[1]

*The Solicitor General* and *Mr. A. N. Frost* and *Mr. Harlow A. Leekley,* Special Assistants to the Attorney General, for the United States.[1]

MR. JUSTICE HUGHES delivered the opinion of the court.

The question presented by this appeal is with respect to the right of Seminole freedmen to convey the lands allotted to them in severalty pursuant to the act of July 1, 1898, c. 542, 30 Stat. 567. The United States sued to cancel conveyances alleged to have been made contrary to the statute. Demurrer to the bill was sustained by the Circuit Court, and its judgment was reversed by the Circuit Court of Appeals. *United States* v. *Allen, and similar cases,* 179 Fed. Rep. 13. So far as the demurrer contested the capacity of the United States to bring a suit of this character, the case stands upon the same footing, in all

[1] See abstract of arguments in *Heckman* v. *United States, ante,* p. 413.

material respects, as that of *Heckman* v. *United States,
ante,* p. 413, and the right of the United States to en-
force such restrictions as may have been imposed upon
the alienation of the allotted lands is no longer open to
dispute.

The inquiry must be, What are the restrictions in the
case of allotments to Seminole freedmen, and have they
been violated?

As to each of the tracts of land in question, it was al-
leged:

"And your orator further shows that each of the tracts
of land hereinafter, in paragraph numbered six, described
is situated in the Eastern District of Oklahoma, and was,
at the time of the transactions of sale or incumbrance
mentioned in that paragraph, allotted lands of the mem-
bers of the Seminole tribe of Indians, allotted to freedman
members of said tribe, and none were lands which had
been patented to individuals at the time of the transac-
tions in question; that they were not lands of heirs of
allottees; that all contracts for the sale, disposition of any
of said allotments prior to the date of patent were ex-
pressly, declared by law, to be void; that this law applied
to all allotments of Seminole lands not inherited from
allottees; that accordingly, defendants had knowledge
and were, by said law, put upon inquiry and notice as to
the inalienability of said unpatented lands, and had
notice accordingly that the particular tracts had not been
patented, any such patenting being a matter of public
record and of public action; that moreover, the un-
patented condition of said allotted lands was notorious
and of common knowledge, since none of the Seminole
allotted lands have been patented; and that other public
laws of Congress and public agreements imposed further
restrictions upon the transfer and incumbrance of the
particular lands herein, in paragraph six, described, be-
longing to the particular class of tribal members herein

mentioned, in addition to those arising from the absence of patenting, and these restrictions were known, notified and notorious in like manner."

While it appears that a large number of conveyances are involved in the suit, only two are specifically described in the printed record on this appeal, the descriptions of the others, as set forth in the bill, having been omitted by stipulation. In the two cases particularly mentioned, the conveyances were made in August, 1906, and March, 1907. It is not stated whether the lands, embraced therein, were homestead or so-called "surplus" lands, but it is conceded in argument that they were of the latter class. The Government says in its brief: "In the printed record it happens that the transactions set out include only lands allotted other than homestead, but other transactions complained of in the bill, omitted from the printed record for the sake of brevity, include lands allotted as homesteads as well." The broad ground is taken by the Government that all conveyances of the lands allotted to members of the Seminole tribe are void because made prior to the date of patent.

By the treaty of 1832 (7 Stat. 368) the Seminoles relinquished to the United States their claim to the lands then occupied in the territory of Florida and agreed to emigrate to the lands assigned to the Creeks west of the Mississippi, it being understood that an additional extent of territory proportioned to their numbers should "be added to the Creek country," and that they should be received "as a constituent part of the Creek Nation." Provision to this effect was made in the Creek treaty of 1833 (7 Stat. 417, 419), which was satisfactory to the Seminoles, and territory was assigned to them accordingly. 7 Stat. 423. There were further agreements in 1845 (9 Stat. 821) and in 1856 (11 Stat. 699). In 1866 (14 Stat. 755), lands which had been ceded to the Seminoles by the Creeks were conveyed to the United States at a stipulated price;

and the United States, having obtained from the Creeks the westerly half of their lands, granted to the Seminoles a tract of 200,000 acres, which was to constitute the national domain of the latter. Subsequently, the United States purchased for the Seminoles another tract, on the east, consisting of 175,000 acres. Acts of March 3, 1873, 17 Stat. 626; August 5, 1882, 22 Stat. 257, 265, c. 390. It was provided in the treaty of 1866, inasmuch as there were among the Seminoles "many persons of African descent and blood, who have no interest or property in the soil and no recognized civil rights," that "these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color who may be adopted as citizens or members of said tribe."

Pursuant to the policy of allotting tribal lands among the individual members of the Five Civilized Tribes (act of March 3, 1893, c. 209, 27 Stat. 645), an agreement was made by the Dawes Commission with the Seminoles on December 16, 1897, which was ratified by the act of July 1, 1898. This agreement provided (30 Stat. 567, c. 542):

"All lands belonging to the Seminole tribe of Indians shall be divided into three classes, designated as first, second, and third class; the first class to be appraised at five dollars, the second class at two dollars and fifty cents, and the third class at one dollar and twenty-five cents per acre, and the same shall be divided among the members of the tribe so that each shall have an equal share thereof in value, so far as may be, the location and fertility of the soil considered; giving to each the right to select his allotment so as to include any improvements thereon, owned by him at the time; and each allottee shall have the sole right of occupancy of the land so allotted to him,

during the existence of the present tribal government, and until the members of said tribe shall have become citizens of the United States. Such allotment shall be made under the direction and supervision of the Commission to the Five Civilized Tribes in connection with a representative appointed by the tribal government; and the chairman of said Commission shall execute and deliver to each allottee a certificate describing therein the land allotted to him.

"All contracts for sale, disposition, or encumbrance of any part of any allotment made prior to date of patent shall be void."

Leases by allottees were permitted upon certain conditions.

The deeds of the allotted lands were to be executed at the termination of the tribal government and each allottee was to designate forty acres which by the terms of the deed should be inalienable and nontaxable as a homestead in perpetuity. The provision on this subject was as follows:

"When the tribal government shall cease to exist the principal chief last elected by said tribe shall execute, under his hand and the seal of the Nation, and deliver to each allottee a deed conveying to him all the right, title, and interest of the said Nation and the members thereof in and to the lands so allotted to him, and the Secretary of the Interior shall approve such deed, and the same shall thereupon operate as relinquishment of the right, title, and interest of the United States in and to the land embraced in said conveyance, and as a guarantee by the United States of the title of said lands to the allottee; and the acceptance of such deed by the allottee shall be a relinquishment of his title to and interest in all other lands belonging to the tribe, except such as may have been excepted from allotment and held in common for other purposes. Each allottee shall designate one tract of

forty acres, which shall, by the terms of the deed, be made inalienable and nontaxable as a homestead in perpetuity."

A supplemental agreement was made with the Seminoles on October 7, 1899, ratified on June 2, 1900 (31 Stat. 250, c. 610), which provided for the enrollment of children born to Seminole citizens to and including December 31, 1899, and all Seminole citizens then living, and also that if any member of the tribe should die after that date the lands, money and other property to which he would be entitled if living should descend to his heirs.

The act of March 3, 1903, c. 994, § 8 (32 Stat. 982, 1008), contained the following provisions as to the duration of the tribal government, the execution, delivery and recording of deeds and the inalienability of homesteads:

"Sec. 8.    That the tribal government of the Seminole Nation shall not continue longer than March fourth, nineteen hundred and six: *Provided;* That the Secretary of the Interior shall at the proper time furnish the principal chief with blank deeds necessary for all conveyances mentioned in the agreement with the Seminole Nation contained in the Act of July first, eighteen hundred and ninety-eight (Thirtieth Statutes, page five hundred and sixty-seven), and said principal chief shall execute and deliver said deeds to the Indian allottees as required by said Act, and the deeds for allotment, when duly executed and approved, shall be recorded in the office of the Dawes Commission prior to delivery and without expense to the allottee until further legislation by Congress, and such records shall have like effect as other public records: *Provided further,* That the homestead referred to in said Act shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the deed for the allotment. A separate deed shall be issued for said homestead, and during the time the same is held by the allottee it shall not be liable for any debt contracted by the owner thereof."

The restriction upon the alienation of homestead lands applied as well to the freedmen as to the other allottees; but it was removed, with respect to the freedmen, by the act of May 27, 1908, c. 199 (35 Stat. 312). This statute, in fixing the status—after sixty days from the date of the act—of the lands of allottees of the Five Civilized Tribes, theretofore or thereafter allotted, provided: "All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions." The present bill was filed on July 23, 1908, and the conveyances it assails were executed before this provision of the act of 1908 became operative. Previous conveyances were not validated by the statute, but on the contrary it declared any attempted alienation or incumbrance of allotted lands, prior to the removal of restrictions, to be void. Section 5, *Id.* 313. It follows that the instruments described in the bill, in so far as they may have purported to convey homestead lands, were executed in violation of law and the Government was entitled to have them set aside.

The "surplus" lands were embraced in the general restriction contained in the agreement of December 16, 1897, ratified by the act of July 1, 1898, that "all contracts for sale, disposition, or encumbrance of any part of any allotment made prior to date of patent shall be void." Apart from the provisions as to leases, this was the only restriction upon the alienation of surplus lands imposed by that agreement, and no further restriction applicable to the freedmen allottees was placed upon such lands by subsequent statute.

The situation with respect to the Seminole allotments may be briefly stated. The commissioners to the Five Civilized Tribes found little difficulty in preparing the rolls of the Seminoles or in making the allotments. The enrollment following the ratification of the agreement of

1897 was begun in July, 1898, and was finished in August of that year. The rolls containing the additional names, provision for which was made by the supplemental agreement of 1899, were forwarded to the Department in December, 1900, and were approved by the Secretary of the Interior on April 2, 1901. (Reports of Commission to Five Civilized Tribes, 1900, p. 12; 1901, p. 30.) In June, 1901, the commission undertook the making of allotments and this was practically completed at an early date. In their report for 1903 (pp. 36, 37), the commissioners said: "The last annual report of the Commission showed the completion of allotment in the Seminole Nation, save as to the recording of a small number of allotments, and the issuance of certificates therefor, which was finished early in the past year." Subsequently there were additional allotments to after-born children in accordance with the act of March 3, 1905. 33 Stat. 1048, 1071, c. 1479. As already noted, the allottees were to receive their deeds on the expiration of the tribal government which, by the act of 1903, was not to continue longer than March 4, 1906. By joint resolution of March 2, 1906, Congress provided for the continuance of "the tribal existence and the present tribal governments" of the Five Civilized Tribes "in full force and effect for all purposes under existing laws," until all the property of the tribes should be distributed (34 Stat. 822); and by the act of April 26, 1906, they were continued "until otherwise provided by law" (§ 28, 34 Stat. 137, 148, c. 1876). While the duration of the tribal government was thus extended, the last mentioned statute expressly authorized the principal chief of the Seminoles meanwhile, that is, before its termination, to execute deeds to allottees. (Section 6, *Id.* 139.) These deeds, however, had not been delivered at the time of the conveyances in question. None of the lands, says the bill, had been patented to individuals, and they were not lands of heirs of allottees.

It is urged that the time for the issuance of patents was fixed as the fourth of March, 1906, and that in law they will be deemed to have been delivered on that date or within a reasonable time thereafter; that although provision was made for the continuance of the tribal government, there was likewise authority for the delivery of the deeds prior to its termination. The contention that the restriction was thus removed cannot be sustained. The agreement of 1897 did not fix a definite time for the termination of the tribal government, and while the act of 1903 set a limit to its existence, Congress was competent to extend it. This was done, and the mere authorization of the execution of patents before the tribal government ceased to exist, cannot be regarded as a repeal of the explicit provision that contracts for the sale or incumbrance of the allotted lands prior to the date of patent should be void. The one did not override the other; they could stand together.

But, in 1904—after the allotments to the Seminoles had been made—the restrictions upon the alienation by adult allottees of the five civilized tribes, who were not of Indian blood, of lands other than homesteads were removed. The provision was as follows (act of April 21, 1904, c. 1402, 33 Stat. 189, 204):

"And all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed, and all restrictions upon the alienation of all other allottees of said tribes, except minors, and except as to homesteads, may, with the approval of the Secretary of the Interior, be removed under such rules and regulations as the Secretary of the Interior may prescribe, upon application to the United States Indian agent at the Union Agency in charge of the Five Civilized Tribes, if said agent is satisfied upon a full investigation of each individual case that such

removal of restrictions is for the best interest of said allottee. The finding of the United States Indian agent and the approval of the Secretary of the Interior shall be in writing and shall be recorded in the same manner as patents for lands are recorded."

This statute undoubtedly applied to allottees of the Seminole Nation, as one of the Five Civilized Tribes, and the enrolled freedmen of that tribe, according to the classification of the commission in making the rolls, fell within the description of allottees "not of Indian blood." The freedmen were persons of African descent—embracing former slaves and their descendants—who had been admitted to the rights of native citizens under the treaty of 1866. (Report of Dawes Commission, 1898, pp. 11, 13.) While the law did not prescribe that a separate roll of freedmen should be made in the case of the Seminoles, the commission in fact made one. As to this they said in their report for 1898 (p. 13), referring to the Seminoles: "Indeed, it is essentially a nation of full-bloods, save as to its colored citizens, who, under treaty provision, are on an equal footing with the citizens by blood. About one-third of the citizens of the Seminole Nation are freedmen, and while the law does not specifically require a separate roll of each of these classes, the commission's data will enable it to so separate them." Accordingly the freedmen in the rolls of the Seminoles, upon which the allotments were based, appear as a class distinct from the citizens by blood. (Final Rolls of Citizens and Freedmen of the Five Civilized Tribes, pp. 615, 627.) And the commissioner to the Five Civilized Tribes in his report for 1908 (p. 7), in stating the total number of the enrolled Seminoles, with the degree of blood of each, gives the number of the citizens of full-blood and of mixed-blood, three-fourths or more, one-half to three-fourths, and less than one-half blood, and then the number of the enrolled freedmen as a separate group. The bill does not allege that the allottees in

question had any Indian blood, but describes them simply
as "freedmen members of said tribe," and in the speci-
fications of the conveyances which appear in the record
the grantors are named as Seminole freedmen whose
names are on the freedmen roll.  The import of the allega-
tion, then, is that these grantors were not of Indian blood,
and, so far as they were adults, they came within the pro-
vision of the act of 1904, removing restrictions upon the
alienation of surplus lands.

These adult grantors stood in precisely the same posi-
tion—after the act of 1904—as though they had received
their allotments without any restriction upon their right
to alienate the interest thus acquired.  It is insisted, how-
ever, that this interest was not of such a character as to be
susceptible of transfer.  This is not a tenable proposition.
Stress is laid upon the provision in the agreement of 1897
that each allottee should have "the sole right of occu-
pancy of the land so allotted to him."  But it is not to be
supposed that by this form of words Congress intended in
the case of the Seminoles to provide that, by virtue of the
allotment, the member of the tribe should receive an
interest of a different nature from that received by al-
lottees of other tribes.  The lands were allotted to the
members of the tribe in severalty, so that each should
have his distinct portion.  The allotments constituted
their respective shares of the tribal property, set apart to
them as such, and while the execution of the deeds was
deferred, each had meanwhile a complete equitable in-
terest in the land allotted to him.  The nature of the al-
lottee's interest is sufficiently shown by other provisions
of the agreement of 1897, as ratified by Congress, and by
statutes *in pari materia*.  In the agreement it was pro-
vided that any allottee might lease his allotment on cer-
tain conditions.  With respect to the townsite of Wewoka,
which was to be controlled and disposed of according to
the provisions of the act of the General Council of the

Seminole Nation of April 23, 1897, it was provided that on extinguishment of the tribal government deeds should issue "to owners of lots" as in the case of allottees. The interest of the allottee was a descendible interest. By the supplemental agreement of 1900, in the case of the death of a member of the tribe after December 31, 1899, the lands "to which he would be entitled if living," were to descend to his heirs. Section 5 of the act of April 26, 1906, relating to "patents or deeds to allottees in any of the Five Civilized Tribes" to be thereafter issued—thus including those to be issued to the Seminole allottees— provided that if any such allottee should die before the deed became effective the title to the lands described therein should "inure to and vest in his heirs," and further, that "in case any allottee shall die after restrictions have been removed, his property shall descend to his heirs *or his lawful assigns,* as if the patent or deed had issued to the allottee during his life" (34 Stat. 137, 138, c. 1876); and § 19 of that act (p. 144) contained a proviso declaring that conveyances theretofore made "by members of any of the Five Civilized Tribes subsequent to the selection of allotment and subsequent to removal of restriction, where patents thereafter issue, shall not be deemed or held invalid solely because said conveyances were made prior to issuance and recording or delivery of patent or deed."

The inalienability of the allotted lands was not due to the quality of the interest of the allottee, but to the express restriction imposed. Their equitable interest was one which in the absence of restriction they could convey. *Doe* v. *Wilson,* 23 How. 457; *Crews* v. *Burcham,* 1 Black, 352; *Barney* v. *Dolph,* 97 U. S. 652, 656; *Jones* v. *Meehan,* 175 U. S. 1, 15–18; *Godfrey* v. *Iowa Land & Trust Co.,* 21 Oklahoma, 293; 95 Pac. Rep. 792; *Mullen* v. *United States,* April 15, 1912, *ante,* p. 448. And, hence, on the removal of the restrictions upon alienation, the adult allottees not of

Indian blood were entitled to convey their surplus lands. So far as the bill assails such conveyances it is without equity.

As all the conveyances made to the appellants are not particularly described in the printed record before this court, it is impossible to specify those which were lawful and those which were obnoxious to the statute. We are of opinion (1) that the bill should be sustained so far as it relates to conveyances of homestead lands; (2) that it should also be sustained to the extent that it is directed against conveyances of surplus lands made by freedmen allottees who were minors and thus excepted from the provision of the act of April 21, 1904, and those made by adult allottees prior to that date; and (3) that so far as the bill relates to conveyances of surplus lands made by adult freedmen allottees subsequent to April 21, 1904, it should be dismissed.

The judgment of the Circuit Court of Appeals will therefore be affirmed, with the modification that the cause shall proceed in conformity with this opinion.

*It is so ordered.*