## SCOTT v. QUIMBY *et al.*

No. 6633.   Opinion Filed March 7, 1916.

(155 Pac. 1154.)

1. **INDIANS—Lands—Validity of Conveyances.** The treaty with the Seminole Tribe of Indians under which allotments were made, bearing date December 16, 1897, and ratified by Act Cong. July 1, 1898, c. 542, 30 Stat. 567, did not fix a definite time for the termination of the tribal government, and, while Act March 3, 1903, c. 994, 32 Stat. 982, set a limit to its existence, Congress was competent to extend it. This was done, and the mere authorization of the execution of patents before the tribal government ceased to exist cannot be regarded as a repeal of the explicit provision that contracts for the sale or incumbrance of allotted lands prior to the date of patent should be void. The one did not necessarily abrogate the other; they could stand together.

2. **SAME—Restrictions on Alienation.** Act Cong. April 21, 1904, c. 1402, 33 St. at L. 189-204, which provides that all the restrictions upon the alienation of lands of all the allottees of the Five Civilized Tribes who are not of Indian blood, except minors, are, except as to the homesteads, hereby removed, has no application to Creek Indians of more than half blood adopted by the Seminoles before the allotment, but is limited in its application to the adopted citizens not of any degree of Indian blood; and **held,** further, that where a person, of any degree of Indian blood, was enrolled by the Dawes Commission as "adopted," parol evidence may be received to show that such person is an Indian, or possesses a quantum of Indian blood, and thereby entitled to all the protection and benefits thereof, notwithstanding such enrollment.

(Syllabus by Robberts, C.)

*Error from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Action by Lucy Scott, formerly Lucy Grayson, against John Quimby and others. Judgment for defendants, and plaintiff brings error. Reversed and remanded, with directions.

*John W. Willmott,* for plaintiff in error.

*Crum, Fowler & Skinner* and *R. V. Biggers,* for defendants in error.

Opinion by ROBBERTS, C.   This action originated in the district court of Seminole county, and was brought by Lucy Scott, *nee* Grayson, against John Quimby, Charles J. Benson, and John Doe, to recover possession and quiet title to 80 acres of land in that county.  The case was tried to the court upon an agreed statement of facts, and judgment rendered in favor of the defendants.   Plaintiff brings error.  The parties will be designated plaintiff and defendants here, the same as below.  The facts in the case are clearly set out in the stipulation, which is as follows:

(1)  "That the plaintiff, Lucy Scott, is a duly enrolled member of the Seminole Tribe of Indians in Oklahoma, her name appearing upon the roll of Indian citizens of said tribe, as distinguished from the roll of Freedman citizens of said tribe, opposite roll No. 1530, under the name of Lucy Grayson."

(2)  "That the said roll does not show the degree of Indian blood of the plaintiff, but that it does show that she is an adopted citizen of said tribe."

(3)  "That, as a matter of fact, the plaintiff is an Indian by blood, possessing more than one-half Creek Indian blood."

(4)  "That during the allotment of lands to the members of the Seminole Tribe of Indians there was duly allotted to the plaintiff, as her surplus allotment, exclusive of the homestead, the following described tract of land in Seminole county, Okla.: The south half of the northeast quarter of section 33 in township 10 north, range 6 east, containing 80 acres."

(5)  "That long prior to the 23rd day of May, 1906, certificate of allotment covering said land was duly issued

to the plaintiff, and that she entered into the possession and occupancy of said land."

(6) "That on the 23rd day of May, 1906, plaintiff joined by her husband, Jim Scott, made, executed, and delivered to the defendant John Quimby a warranty deed purporting to convey said land to him, and that said deed has been placed of record in the office of the register of deeds for Seminole county, Okla., at Wewoka, in Book K, at page 501."

(7) "That on the 28th day of May, 1906, the said John Quimby made, executed, and delivered to C. J. Benson, defendant, a warranty deed purporting to convey said land to said Benson, which said deed appears of record in said register's office in Book 16, at page 330."

(8) "That the defendants, John Quimby, C. J. Benson and John Doe, are in the actual possession of said tract of land, and have been in such possession during the years 1909, 1910, 1911, and 1912, and during said years have taken all rents and profits from said land, which were of the actual value of $150 per year."

(9) "That the plaintiff has never executed any other conveyance of said land, except the said deed to the defendant John Quimby, and that she is the owner of the legal and equitable title and estate in and to said land, and entitled to its immediate possession, unless title was passed by the said deed of May 23, 1906."

(10) "That the defendants have excluded and kept the plaintiff out of the possession of said land during the years 1909, 1910, 1911, and 1912, and, unless the said deed of May 23, 1906, is a valid conveyance, the said defendants have unlawfully and wrongfully kept the plaintiff out of the possession of said lands, and still unlawfully and wrongfully withhold it from her."

(11) "That the said defendant John Quimby paid to the plaintiff for said conveyance of May 23, 1906, the sum of $200."

(12) "That on the 16th day of February, 1912, the plaintiff filed in this court her action in ejectment and to quiet title to said lands against the above-described conveyances, alleging that she was the owner of the legal and equitable title in and to said land, that she was entitled to the possession of it, and that the defendants were unlawfully and wrongfully withholding said land from her, and had been so withholding it during the said years 1909, 1910, 1911, and 1912, and alleging all the facts herein before set out, and that said pretended conveyances constituted clouds upon the title of the plaintiff to said lands, and tendering back to the defendant John Quimby, or the person to whom the courts might order it paid, the said sum of $200, together with interest thereon at the rate of 6 per cent. per annum from the 23rd day of May, 1906, and praying judgment for the possession of said land, and for damages in the sum of $150 per year for each of the four years, and that said conveyances be canceled and removed as clouds from the plaintiff's title to said land, and that the plaintiff's title to said land be quieted as against the adverse claims of the said defendants and all persons claiming under them."

(13) "To which petition the defendants in due time filed their general denial.

"Dated this 7th day of January, A. D. 1913."

To reverse the case plaintiff makes two assignments:

(1) The court erred in overruling the motion for new trial.

(2) The court erred in not rendering judgment for the plaintiff upon the agreed statement of facts.

As the motion for new trial was not necessary, and therefore does not present any errors for consideration, it will receive no further attention.

The real question presented in the second assignment is that the court erred in holding that the deed from plain-

tiff and husband to John Quimby, dated May 23, 1906, and referred to in the sixth paragraph of the stipulation, was a valid and binding conveyance of the land. Three important facts are settled by the stipulation: (1) In paragraph 3 that plaintiff is a Creek Indian by blood of more than one-half quantum; (2) in paragraph 1 that her name appears upon the roll of Indian citizens of the Seminole Tribe of Oklahoma, as distinguished from the roll of Freedman citizens of said tribe, opposite the roll No. 1530, under the name of Lucy Grayson; (3) in paragraph 2 that the roll does not show the quantum of Indian blood, but does show that she was an adopted citizen of the Seminole Tribe. It is agreed that the land involved is the surplus allotment of plaintiff, and that she had received her allotment certificate therefor long before the 23d day of May, 1906, but the patent had not been issued.

Plaintiff contends that the conveyance was void because the land was within that class known as restricted Indian allotments. The treaty with the Seminoles under which the allotments were made, bearing date December 16, 1897, ratified by Congress July 1, 1898 (30 Stat. at L. 567 c. 542), contained the following comprehensive and absolute restriction upon alienation:

"All contracts for sale, disposition, or encumbrance of any part of any allotment made prior to date of patent shall be void."

As throwing light upon the time when such patents would be delivered, the said treaty contained the further provision:

"When the tribal government shall cease to exist the principal chief last elected by said tribe shall execute, under his hand and the seal of the Nation, and deliver to

each allottee a deed conveying to him all the right, title,. and interest of  *  *  *  said Nation and the members. thereof in and to the lands so allotted to him, and the Secretary of the Interior shall approve such deed.  *  *  *"·

Act Cong. March 3, 1903, c. 994, sec. 8 (32 Stat. at L. 982, 1008), contained the following provision as to the duration of the tribal government and the execution, delivery, and  recording of deeds or patents:

"Sec. 8.   That the tribal government of the Seminole Nation shall not continue longer than March fourth, nineteen hundred and six:   Provided, that the Secretary of the. Interior shall at the proper time furnish the principal chief with blank deeds necessary for all conveyances mentioned in the agreement with the Seminole Nation contained in the act of July first, eighteen hundred and ninety-eight (30 Stat. at L. 567, chap. 542), and said principal chief shall execute and deliver said deeds to the Indian allottees,  *  *  *  and the deeds for allotment, when duly executed and approved, shall be recorded in the office of the Dawes Commission prior to delivery.  *  *  *"

By joint resolution of March 2, 1906, two days before the tribal existence would have expired under the act last above mentioned, Congress provided for "the continuance of tribal existence and present tribal governments" of the Five Civilized Tribes "in full force and effect for all purposes under existing laws" until all the property of the tribes should be distributed (34 Stat. at L. 822) ; and by the act of April 26, 1906 (section 28) "the tribal existence and present tribal governments" of said tribes were continued "for all purposes provided by law until otherwise authorized by law" (34 Stat. at L. 137, 148, c. 1876). While the duration of the tribal government was thus extended, the last-mentioned statute expressly authorized the principal chief of the Seminoles before the termination of the

tribal government to execute deeds to allottees.  Section 6, Id., 139.  No Seminole patents, however, were issued under this authority for several years, but were held up by the Secretary of the Interior until the Supreme Court of the United States held that acts removing restrictions applied to the Seminoles, who had received no patents, in the same way that those acts applied to the other tribes, which had received patents.

It was contended that, since Congress had once fixed the 4th of March, 1906, as the time when the tribal government should cease to exist, the circumstances which by the treaty were to determine when patents were due, Congress could not change that date, and that therefore the patents were all due March 4, 1906, and would be deemed to have been delivered on that date or within a reasonable time thereafter, and consequently all restrictions passed off at that time as to all classes of citizens of the tribes, even as to full bloods.  This same contention was urged before the Supreme Court of the United States, and was finally disposed of in the case of *Alfred F. Goat et al. v. United States*, 224 U. S. 458, 32 Sup. Ct. 544, 56 L. Ed. 841.  In that case there were before the court certain conveyances executed in August, 1906, and March, 1907, prior to the delivery of any of the Seminole patents, and that court, speaking through Mr. Justice Hughes, in answer to the above argument, said:

"It is urged that the time for the issuance of patents was fixed as the 4th of March, 1906, and that in law they will be deemed to have been delivered on that date or within a reasonable time thereafter; that although provision was made for the continuance of the tribal government, there was likewise authority for the delivery of the deeds prior to its termination.  *The contention that the restric-*

*tion was thus removed cannot be sustained.* [Italics ours.] The agreement of 1897 did not fix a definite time for the termination of the tribal government, and, while the act of 1903 set a limit to its existence, Congress was competent to extend it. This was done, and the mere authorization of the execution of patents before the tribal government ceased to exist cannot be regarded as a repeal of the explicit provision that contracts for the sale or incumbrance of the allotted lands prior to the date of patent should be void. The one did not override the other; they could stand together."

In the so-called Indian lands suits, affecting Seminole land, it was the contention of the government that, because the Seminole patents had been withheld by the Secretary of the Interior, Seminole citizens had no title which they could alienate; and it was not until after the decision of the Alfred Goat Case, *supra,* which was decided April 29, 1912, that the Secretary permitted any patents to issue. In the meantime Congress, by the Restrictions Bill of May 27, 1908, had fixed the status of all tribal lands as to alienation.

In view of the foregoing statutes and law, we cannot hold that plaintiff, on the 23d day of May, 1906, had the power to alienate her surplus land.

It being settled that the restriction was not removed by the acts of Congress, it is contended that, plaintiff being enrolled as an adopted member of the tribe, she would necessarily be held in law to have no degree of Indian blood, and therefore not within the class of citizens whose lands were restricted from sale.

The first act permitting alienation of Seminole lands was Act Cong. April 21, 1904, c. 1402, 33 Stat. at L. 189, 204, which provided:

"And all the restrictions upon the alienation of lands of all allottees of * * * the Five Civilized Tribes * * * who are not of Indian blood, except minors, are, except as to homesteads, hereby removed."

It cannot be contended that this act had any application to the plaintiff in error. It is limited in its application to those "not of Indian blood." The plaintiff in error was listed upon that part of the approved rolls of the Seminoles known as the rolls of Indians by blood, as distinguished from the Freedman roll. It is true that the word "adopted" appeared opposite her name, instead of anything indicating her blood; but it is also an admitted and agreed fact in this case that she was, in fact, of more than one-half Indian blood. This act does not admit of construction. It is too plain. By its terms it applies to those "not of Indian blood." Whether an allottee had Indian blood or not was left a question of fact to be determined upon the proofs, just like any other fact.

Now, if this act of April 21, 1904, which was the first act removing restrictions, did not remove her restrictions, and manifestly it did not, what act did? It may be contended that section 19 of the act of April 26, 1906, had such effect. That section provided as follows (34 Stat. at L. 144):

"Sec. 19. That no full-blood Indian of the Choctaw, Chickasaw, Cherokee, Creek or Seminole Tribes shall have power to alienate, sell, dispose of, or encumber in any manner any of the lands allotted to him for a period of twenty-five years from and after the passage and approval of this act, unless such restrictions shall, prior to the expiration of said period, be removed by act of Congress; and for all purposes the quantum of Indian blood possessed by any member of said tribes shall be determined

by the rolls of citizens of said tribes approved by the Secretary of the Interior. * * *"

But the roll in this instance does not show the quantum of Indian blood. The only showing is that she is an adopted citizen of the tribe.

In the case of *United States v. Stigall* (U. S. C. C. A.) 226 Fed.. 190 (No. 4256), filed September 4, 1915, that court having under consideration the same question, Mr. Justice Smith, speaking for the court, says.:

"This is an action in equity brought by the United States under the rule laid down by this court in the *United States v. Allen*, 103 C. C. A. 1, 179 Fed. 13, as affirmed by the Supreme Court in *Heckman v. United States*, 224 U. S. 413 [32 Sup. Ct. 424, 56 L. Ed. 820], and subsequent cases. A motion to dismiss for lack of jurisdiction and for want of equity was filed and sustained upon the latter ground. The case was dismissed, and the government appeals.

"It appears from the bill of complaint that Munnah was a female Creek Indian of the full blood. She married London Coker, who was a Creek Indian of the half blood. She long resided in the Seminole Nation, and became a member of that tribe by adoption and was so enrolled. She had one son, Jeff Coker, who was by blood three-fourths Creek, and, for aught that appears, one-fourth white. He was enrolled as a Seminole of the half blood, and died in November, 1900, leaving Munnah, his mother, as his sole heir. July 1, 1898, Congress passed 'An act to ratify the agreement between the Dawes Commission and the Seminole Nation of Indians.' A provision of this act is as follows: 'All contracts for sale, disposition, or incumbrance of any part of any allotment made prior to date of patent shall be void.' 30 Stats. 467.

"Subsequently, but before the execution of the deed here in question, Congress passed on April 26, 1906, the following law:

" 'Sec. 19.  *  *  *  And for all purposes the quantum of Indian blood possessed. by any member of said tribes shall be determined by the rolls of citizens of said tribes approved by the Secretary of the Interior.  *  *  *

" 'Sec. 22.  *  *  *  All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe.'

"34 Stats. 137-145.

"On May 8, 1906, Munnah, without the approval of the Secretary of the Interior, by warranty deed conveyed 80 acres of her own allotment and 120 acres allotted to her son, Jeff Coker, or a total of 200 acres, to the appellee, J. G. Stigall, for $200.  This was before any patent had been issued upon any of the land.

"Separate rolls were made of the Seminoles by blood and the freedmen, but no separate roles were made of the adopted citizens, but they were carried in the rolls of the Seminoles by blood.  The freedmen were all of African descent, and their character is quite fully explained in *Nunn v. Hazelrigg*, 216 Fed. 330.  The Indians as a rule never submitted to slavery.  Therefore, if one were entered upon the freedman's roll, it would appear he was not an Indian.  But how about those entered upon the roll of Seminoles by blood as adopted?  Every human being was capable of adoption by the tribe, whether of the red race but of another tribe, the white, the black, the brown, or the yellow races.  It is almost a matter of common knowledge that some Indians, having ceased the nomadic life of their ancestors, found their relief from the tedium of the new domestic system in a change of tribes.  It is conceded there were 20 persons on the Seminole roll by adoption, but it does not appear whether they were Indians of other tribes or to what race they belonged.  What, therefore, does the entry of a name on the roll of Seminoles by blood of one as a member of the tribe by adoption indicate as to what race he belonged to?  Absolutely nothing.  The Dawes Commission, it is true, was a quasi judicial body, but the

entry upon a roll of the Seminoles by blood that a given person became a member of the tribe by being adopted was no more an adjudication that he is one of the white race than that he is an Indian.

"We conclude that the judicial body, the Dawes Commission, never made any adjudication as to whether Munnah was a white woman or an Indian, and the case is reversed and remanded, with instructions that the motion to dismiss should have been overruled, and to set aside the court's order to the contrary, and to give the appellee an opportunity to answer."

After a somewhat careful consideration of the entire record, assisted by the able brief of counsel for plaintiff in error, we are driven to the conclusion that the conveyance from Lucy Scott to John Quimby, dated May 23, 1906, and recorded in the office of the register of deeds of Seminole county in Book K, at page 501, and also the deed from John Quimby to C. C. Benson, dated May 28, 1906, recorded in the same office in Book 16, at page 330, are both void, and should be held for naught and canceled of record, and that plaintiff should have judgment for immediate possession of said land, with decree quieting the title to the land in her, with judgment against defendants Quimby and Benson, and possession of said premises in accordance with the agreed statement of facts herein, and that the judgment herein should be reversed, and the case remanded to the district court of Seminole county, with directions to that court to set aside said judgment upon the payment by plaintiff into court of the sum of $200, to be disposed of upon the order of the court as per the agreed statement of facts, as near as may be, and as equity and justice may require, and to enter decree in accordance herewith.

By the Court: It is so ordered.