## MOORE v. CARTER OIL CO.
### No. 264.

Circuit Court of Appeals, Tenth Circuit.
Sept. 2, 1930.

W. E. Stanley and Chester I. Long, both of Wichita, Kan. (Thomas H. Owen and Ned Looney, both of Oklahoma City, Okl., on the brief), for appellant.

L. G. Owen, of Tulsa, Okl. (James A. Veasey, of Tulsa, Okl., on the brief), for appellee.

Robert L. Owen, of Washington, D. C., as amicus curiæ.

Before LEWIS, PHILLIPS, and Mc-DERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

Appellant brought this bill claiming that he is owner of the mineral estate in 40 acres in Seminole County, Oklahoma. He alleged appellee had entered upon the land without right and extracted therefrom oil and gas of great value, and he seeks an accounting. Appellee in its answer admitted that it had mined the premises for oil and gas under a lease for that purpose given to one Hudson on January 16, 1926; alleged that Hudson later assigned the lease to appellee, that the lease to Hudson was given by one Whitney, who was then the owner of the entire fee simple title to said land, that appellant has no interest or title whatsoever thereto and asked that its leasehold estate be quieted as against appellant. On final hearing the court found the issues in favor of appellee and dismissed the bill with prejudice.

The case was submitted on an agreed statement of facts, from which it appears appellant is a Seminole freedman enrolled as such by the Dawes Commission on the rolls of the Seminole Nation of Indians, and on December 22, 1905, the Commission allotted to him out of tribal lands of the nation said 40 acres; that in the year 1912 a patent was issued to him as grantee of the land, signed by the Principal Chief of the nation and approved by the Secretary of the Interior; that on July 7, 1911, the legal guardian of appellant executed his guardian's deed purporting to convey all interest and title of appellant to the land in controversy to one Jayne, that Jayne by warranty deed conveyed to Dyer, Dyer by warranty deed conveyed to Sinclair, Sinclair by warranty deed conveyed to Weast, Weast by warranty deed conveyed to Appling, Appling by warranty deed conveyed to Whitney and Whitney gave the lease to Hudson; in 1928 appellee drilled a well on the 40 acres and since has produced oil continuously therefrom. The only interest appellee claims is under the lease to Hudson. There was no development of oil or gas or other mineral prior to the issuance of said patent to appellant. According to the enrollment of the Seminoles by the Commissioners to the Five Civilized Tribes appellant became 21 years of age on August 15, 1921, so his right to enrollment and allotment was regarded as being under the Act of March 3, 1905 (33 Stat. 1048). The guardianship proceedings of his person and estate terminated more than five years before the bill of complaint herein was filed, to-wit, May 31, 1929. All of the grantees beginning with Jayne successively took actual possession of the 40 acres and held uninterrupted possession under claim of ownership. Since the date of the guardian's deed appellant has never at any time been in possession of said 40 acres. He does not now nor has he since the execution of his guardian's deed claimed any interest whatsoever in the surface of the 40 acres and he has never, until the institution of this suit, brought any suit to establish his claimed right to the mineral therein.

It is appellant's contention that he took title to the surface only when the land was allotted to him, but that by the patent of 1912, which was after his guardian's deed, he first became owner of the mineral estate. To sustain this contention counsel argue that the Curtis Act of June 28, 1898 (30 Stat. 495), severed the two estates, that the allotment gave appellant a right to the surface only, thus reserving the mineral estate in the Tribe as communal property until the patent was issued, and that there is nothing in the Seminole Agreement (30 Stat. 567), ratified by Congress July 1, 1898, contrary to this contention, but that said agreement is in accord therewith. The Curtis Act is entitled: "An Act for the protection of the people of the Indian Territory, and for other purposes." It applied to all of the Five Civilized Tribes. Section 11, on which appellant chiefly relies, and insofar as material here, reads:

"That when the roll of citizenship of any one of said nations or tribes is fully completed as provided by law, and the survey of the lands of said nation or tribe is also completed, the commission heretofore appointed under Acts of Congress, and known as the 'Dawes Commission,' shall proceed to allot the exclusive use and occupancy of the surface of all the lands of said nation or tribe susceptible of allotment among the citizens thereof, as shown by said roll, giving to each, so far as possible, his fair and equal share thereof, considering the nature and fertility of the soil, location, and value of same; but

all oil, coal, asphalt, and mineral deposits in the lands of any tribe are reserved to such tribe, and no allotment of such lands shall carry the title to such oil, coal, asphalt, or mineral deposits. * * *

"Provided further, That the lands allotted shall be non-transferable until after full title is acquired. * * *"

Other sections provide for the protection of allottees in the possession of their allotments. It is contended that allotments of Seminole lands were made under said section 11, and that it severed the surface as property from the mineral estate. This, it is said, is fortified by a paragraph found in the Act of July 1, 1898 (30 Stat. 567), to be presently considered, which ratified the agreement between the Dawes Commission and the Seminole Nation. But it is not of light significance on the point that the allotment certificate to appellant issued by the Dawes Commission December 22, 1905, did not mention the Curtis Act, but it purported to issue by authorization of that paragraph in the Act of March 3, 1905 (33 Stat. 1048, 1071, § 1), set forth in the certificate and reading:

"That the Commission to the Five Civilized Tribes is authorized for ninety days after the date of the approval of this Act to receive and consider applications for enrollment of infant children born prior to March 4, 1905, and living on said latter date, to citizens of the Seminole tribe whose enrollment has been approved by the Secretary of the Interior; and to enroll and make allotments to such children giving to each an equal number of acres of land, and such children shall also share equally with other citizens of the Seminole tribe in the distribution of all other tribal property and funds."

The reason for relying on this statute in making the allotment is obvious. It provided for additional enrollments and of a class to which appellant belonged, and that allotment should be made to them. Clearly the Commission must have believed, and rightly we are convinced, that it was an extension of the allotment provisions found in the Seminole Agreement. The several enrollments of the Seminoles are referred to in Goat v. United States, 224 U. S. 465, 466, 32 S. Ct. 544, 56 L. Ed. 841. Nor did the patent executed by the Principal Chief of the Seminole Nation, of date August 9, 1912, and approved by the Secretary of the Interior, conveying the 40 acres to appellant, mention the Curtis Act, but it by reference relied for its issuance on the agreement with the Seminole Nation (30 Stat. 567); and its granting clause runs thus:

"Now, therefore, I, the undersigned, the Principal Chief of the Seminole Nation, by virtue of the power and authority vested in me by law, have granted and conveyed, and by these presents do grant and convey unto the said Arvey Moore, all right, title, and interest of the Seminole Nation, and of all other members of said Nation, in and to the following described lands" (describing the 40 acres).

These are appellant's muniments of title, and there is no suggestion in either allotment certificate or patent of segregated estates in the 40 acres, nor that the certificate was only for surface rights and that the patent conveyed only the mineral estate. According to their import the allotment certificate gave appellant an equitable title to the whole 40 and the patent confirmed in him a fee simple which, as will be seen, are contrary to the purpose of the Curtis Act. These executive acts in discharge of official duties imposed on government officers and the chief officer of the Seminole Nation are not without great weight in a judicial determination of what statutes were applicable to the situation.

We now quote parts of the Seminole Agreement that need consideration:

"All lands belonging to the Seminole Tribe of Indians shall be divided into three classes, designated as first, second, and third class; the first class to be appraised at five dollars, the second class at two dollars and fifty cents, and the third class at one dollar and twenty-five cents per acre, and the same shall be divided among the members of the tribe so that each shall have an equal share thereof in value, so far as may be, the location and fertility of the soil considered; giving to each the right to select his allotment so as to include any improvements thereon, owned by him at the time; and each allottee shall have the sole right of occupancy of the land so allotted to him, during the existence of the present tribal government and until the members of said tribe shall have become citizens of the United States. Such allotment shall be made under the direction and supervision of the Commission to the Five Civilized Tribes in connection with a representative appointed by the tribal government; and the chairman of said Commission shall execute and deliver to each allottee a certificate describing therein the land allotted to him. * * *

"No lease of any coal, mineral, coal oil, or natural gas within said Nation shall be valid unless made with the tribal govern-

ment, by and with the consent of the allottee and approved by the Secretary of the Interior.

"Should there be discovered on any allotment any coal, mineral, coal oil, or natural gas, and the same should be operated so as to produce royalty, one-half of such royalty shall be paid to such allottee and the remaining half into the tribal treasury until extinguishment of tribal government, and the latter shall be used for the purpose of equalizing the value of allotments; and if the same be insufficient therefor, any other funds belonging to the tribe, upon extinguishment of tribal government, may be used for such purpose, so that each allotment may be made equal in value as aforesaid. * * *

"When the tribal government shall cease to exist the Principal Chief last elected by said tribe shall execute, under his hand and the seal of the Nation, and deliver to each allottee a deed conveying to him all the right, title, and interest of said Nation and the members thereof in and to the land so allotted to him, and the Secretary of the Interior shall approve such deed, and the same shall thereupon operate as relinquishment of the right, title and interest of the United States in and to the land embraced in said conveyance, and as a guaranty by the United States of the title of said lands to the allottee; and the acceptance of such deed by the allottee shall be a relinquishment of his title to and interest in all other lands belonging to the tribe, except such as may have been excepted from allotment and held in common for other purposes."

The Act did except and reserve other lands for a townsite and for schools. It is insisted that the provision that all mineral leases shall be made with the tribal government is confirmatory of the Curtis Act, in that it recognizes the two separate estates and that the mineral remained communal property of the tribe,—else why should the tribal government be the lessor. But the allottee's consent to a lease was indispensable, and one-half the royalty was to be paid to him while the other half was to be paid into the tribal treasury for a special purpose during a limited time. The inference that the allottee should receive all of the royalty on the expiration of the temporary period is unavoidable; else what purpose can be attributed to the last paragraph, which gave the allottee a right to title in fee at the expiration of the temporary period and debars the Nation and all its other members of any right, title or interest therein.

Plainly, the intention of the Agreement was to divide tribal lands equally, insofar as that could be done, among the members, giving to each absolute ownership in severalty. There was further provision in the Agreement: "All moneys belonging to the Seminoles remaining after equalizing the value of allotments as herein provided and reserving said sum of $500,000 for school fund shall be paid per capita to the members of said tribe in three equal instalments;" and it contained restrictions upon alienation of allotments before patent. Later Congress passed the Act of May 27, 1908 (35 Stat. 312), in the eleventh section of which it expressed in substance its finding that the special purpose of paying one-half of the royalties under mineral leases into the tribal treasury had been accomplished, and declared "That the interest of the Seminole Nation in leases or royalties arising thereunder on all allotted lands shall cease on June 30, 1908," and directed that all royalties arising after that date should go to the allottees, "and no such lease shall be made after said date except with the allottee or owner of the land." The Seminole Agreement plus the paragraph supra in the Act of March 3, 1905, were complete in providing for allotment of all Seminole tribal lands in severalty, except those reserved for special purposes, and for passing fee title thereto to allottees; whereas, the Curtis Act was for the special purpose of breaking up the then existing monopolistic possession and use of lands of the Five Tribes. Aggressive and dominating members and intruding whites had gained possession and control of large areas, regardless of whether mineral or non-mineral, to the exclusion of other members with equal rights in the tribal domain, and were using them to their private advantage. Its provisions for allotments were only in furtherance of that purpose and to protect those who should be put in possession under that Act against aggressors and intruders. It was a special measure for a particular purpose, with no provision for conveying title to Seminole allottees, and was introduced, considered and passed at a time when Congress was in doubt of its power to force division in severalty without consent of the tribes, or if it had the power, whether it was good policy to exercise it without that consent. The Agreement with the Seminoles for allotments in severalty and conveyance of titles to allottees was ratified soon thereafter. The Curtis Act is fully discussed and elucidated in Woodward v. De Graffenried, 238 U. S. 284, 35 S. Ct. 764, 770, 59 L. Ed. 1310. From what was there

said we must conclude that appellant's contentions are without merit. We quote from the opinion in that case:

"From what has been said and quoted, however, it very clearly. appears that the purpose of Congress in the allotment provisions of section 11 [Curtis Act], and in those quoted from sections 16, 17, and 23, which should be read in the same connection, was not to interfere at all with the tribal title to the allotted land unless with the consent of the tribe, manifested either by approval of the Agreement for that purpose submitted, or by tribal action under section 15 of the act of 1893; that the Curtis act had for its object the administration of the trusts imposed upon the several tribes by the early treaties, and which the tribes had failed to enforce; namely, that the beneficial use of the tribal domain should be enjoyed equally by all the members of the tribe, and that monopolization of it in any form or by any means should be prevented. * * * Section 11, we repeat, conferred only a personal right to the exclusive use and occupancy of the surface, to be enjoyed by persons identified by the Dawes Commission as properly entitled to a place upon the citizenship rolls. * * * And the manifest purpose of the Curtis act was not to displace but to recognize the communal titles, and to administer the use of lands for the equal benefit of the members of the tribe according to the true intent and meaning of the early treaties; the effort being to do what the tribal government ought to have done, but were failing to do. That this meaning was placed upon the act by the Secretary of the Interior will appear from the administrative regulations issued to the Dawes Commission, excerpts from which are set forth in the marginal note, infra."

The court then refers to the case of Goat v. United States, 224 U. S. 458, 32 S. Ct. 544, 56 L. Ed. 841, which dealt with the right of Seminole freedmen to convey their allotments before patents, wherein it was held the allotments constituted the respective shares of allottees in tribal property and that each had before patent "a complete equitable interest in the land allotted to him." The opinion in the De Graffenried Case continues:

"But this was because it was so agreed between the United States and the tribe, and has no bearing upon the proper construction of section 11 of the Curtis act, which was intended to have effect without consent of the tribe, and was enacted at a time when it was seriously doubted by Congress whether, without such consent, the tribal title could be divested in favor of an allottee."

It was said as to allotments made under that Act: "These selections were treated as 'preliminary,' and the allotments as 'temporary.'" It was further said such allotments conferred only a provisional surface right. There was, then, no division of allotments into separate estates by that Act; and by the Agreement allottees were to be given titles in fee. No language more apt and forceful to that end could have been used than that found in the Seminole Agreement. It provided not only that deeds to allottees should convey to them all the right, title and interest of the Nation and its members in the allotments, but added that each allottee, in accepting a deed to his allotment, relinquished his interest in all other allotments,—a transmutation of the tribe's communal estate to private ownership in severalty by its enrolled members.

It has been noted that the Seminole Agreement contained restrictions against alienation of allotments prior to patents. Congress by the Act of April 21, 1904 (33 Stat. 189, 204, § 1), removed restrictions upon alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who were not of Indian blood, except minors, and except as to homesteads. In view of that statute and sections 5 and 19 of the Act of April 26, 1906 (34 Stat. 137), it was held in Goat v. United States, supra, that a Seminole freedman could, before patent issued for his allotment, convey full title thereto. By the Act of May 27, 1908 (35 Stat. 312), entitled: "An Act for the removal of restrictions from part of the lands of allottees of the Five Civilized Tribes, and for other purposes," it is provided:

"That from and after sixty days from the date of this Act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood, including minors, shall be free from all restrictions." Section 1.

That Act, in its sixth section, further provided:

"That the persons and property of minor allottees of the Five Civilized Tribes shall, except as otherwise specifically provided by law, be subject to the jurisdiction of the probate courts of the State of Oklahoma."

The Act of April 26, 1906 (34 Stat. 137, 139, § 6), provided:

"That the principal chief of the Seminole Nation is hereby authorized to execute the deeds to allottees in the Seminole Nation prior to the time when the Seminole government shall cease to exist."

No attack or criticism is made on the guardian's deed of July 7, 1911, as in any manner ineffective or insufficient to convey all title of appellant to the 40 acres. The patent of August 9, 1912, referred to it as a homestead allotment. Applying the rule announced in the Goat Case and the statutes to which reference has just been made, we think it must follow that the grantee in the guardian's deed took good title to the whole estate in the 40 acres.

The decree is affirmed.