FISH et al. v. WISE et al.
No. 411.

Circuit Court of Appeals, Tenth Circuit.
Sept. 25, 1931.

Robert L. Owen, of Washington, D. C. (Frank J. Boudinot, of Washington, D. C., D. H. Linebaugh, of Muskogee, Okl., and Henry G. Thomas, of Washington, D. C., on the brief), for appellants.

Lloyd G. Owen, of Tulsa, Okl., and John T. Gibson, of Muskogee, Okl. (James A. Veasey, of Tulsa, Okl., Floyd C. Dooley, of Okemah, Okl., C. P. Gotwals, W. A. Killey, and James D. Gibson, all of Muskogee, Okl., F. M. Goodwin, of Washington, D. C., H. G. House, and R. S. Cate, both of Muskogee, Okl., on the brief), for appellees.

Before LEWIS and COTTERAL, Circuit Judges, and POLLOCK, District Judge.

LEWIS, Circuit Judge.

This bill purports to be a class suit. It was exhibited by several enrolled Seminole Indians and heirs of deceased enrolled Seminoles in behalf of all " 'The Seminoles,' comprising a group of citizens of the State of Oklahoma, and of the United States, composed of 3,119 persons on the finally approved Seminole rolls, or their heirs, * * *, and whether they be of Indian blood or not, * * *." It is alleged in the introductory clause that the Seminoles "own exclusively all of the coal, mineral, oil and gas in Semi-

nole County in fee simple by an unbroken chain of title, * * *." The bill is directed against Walter Wise, Seminole allottee, and all other Seminole allottees who claim royalties from or the ownership of oil, gas and other mineral found in the lands allotted to them, also against their grantees or lessees and against a named oil company and a pipe line company that produce or transport oil and gas from leased allotments. Some seventeen enrolled Seminole Indians and others who are heirs of enrolled Seminoles holding allotments as original allottees or as heirs, from which oil and gas is being produced and from which they receive royalties, intervened as defendants.

On defendants' motions the bill was dismissed with prejudice as being without equity, and the plaintiffs appealed.

The suit in practical purpose is in behalf of those who have non-mineral Seminole allotments against those whose allotments contain mineral to compel the latter to share per capita with the former all mineral produced.

"The Seminoles" (plaintiffs) ask in the bill in its stating part to be subrogated as lessors in all existing mineral leases made by Seminole allottees, their heirs or grantees, and to be recognized as owners of the coal, mineral, oil, and gas. It is alleged that "The Seminoles" do "not own this property by communal title but by ownership in common as an undivided whole by a grant from themselves as the then Seminole Tribe to themselves who were living on December 31, 1899, as individuals as grantees as of that date, and their heirs, * * *; that the second Seminole agreement was an action taken by the owners of the property as of December 31, 1899, at which time and on which day the Seminole tribe still owned the title to the mineral, oil, and gas, and as owners transferred that ownership of the mineral, oil, and gas as an undistributed whole to themselves by the simple process of declaring that the final rolls should be as of that particular day upon which the distribution of the allotted lands, the funds and the other property belonging to the Seminole Indians should be made. The right, therefore, to the undivided mineral, oil, and gas and to its distribution vested as a property right in the Seminoles as of that day and to their heirs."

The Seminole Agreement was approved by Act of Congress, July 1, 1898 (30 Stat. 567). The Supplemental Agreement with the Seminoles was approved by Congress, June 2, 1900 (31 Stat. 250). It is this supplemental agreement on which the bill relies

as passing the communal title of the tribe in the mineral to the enrolled Seminoles as tenants in common; and perforce of that contention it must be established that it was not the intention of the tribal government in its agreement of July 1, 1898, that the fee title in allotments should pass from the tribe to the allottees. We held in Moore v. Carter Oil Co., 43 F.(2d) 322, it was intended by the agreement that allottees should get full titles to their allotments, and that the agreement as executed, per its direction, vested in them titles in fee simple. Counsel are critical of our opinion in that case and say we went further on the subject of title than the issues and facts required. So, we put it aside for the moment and notice the principal points on which appellants contend that Seminole allottees acquired title only to surface rights in their allotments, and that the mineral estate was held by the tribe as communal property until the approval of the Supplemental Agreement on June 2, 1900.

First, they say that when the Seminole Agreement was entered into and approved by Congress, as also the agreements with the other civilized tribes, it was then the settled policy of the United States to reserve the mineral estate, when mineral lands were allotted, to the tribe, and they cite the Osage Allotment Act of June 28, 1906 (34 Stat. 539). The act relied on was passed eight years after the date it is claimed the policy existed. Indeed the General Allotment Act of February 8, 1887 (24 Stat: 388), is evidence to the contrary. That act provided that allottees to whom allotments might be made under it should have titles in fee simple. Moreover, the act which initiated the procedure for agreements with the five civilized tribes (27 Stat. 645, 646, § 16) did not contemplate, if tribal lands should be divided between the members thereof, that any tribal interest or estate should remain in those lands. There is no suggestion of a reservation. The act contemplated two methods of extinguishing tribal titles,—by a cession of the lands to the United States for a consideration or their division in severalty among the members of the tribe. No thought of reserving the mineral estate to the tribe as such is suggested or intimated in either event. It was intended by Congress that those agreements would extinguish the tribal title, and necessarily the whole of it.

Second, in further support of the foregoing contention much reliance seems to be placed on a written proposition made to the Seminoles by the Dawes Commission on July 26, 1894. This proposition is set forth in the bill. The Commission, after referring to the act under which it was appointed, said to the Seminoles and so reported to Congress: We "propose to treat with the Seminole Nation on the general lines indicated below, to be modified as may be deemed wise by both parties after discussion and conference."

"First. To divide all lands now owned by the Seminole Nation, not including town sites, among all citizens according to the treaties now in force, reserving town sites, coal and mineral, for sale under special agreement. * * *

"Third. Town sites, and coal and mineral discovered before allotment, to be the subjects of special agreements between the parties— * * *

"Fifth. All invested funds, not devoted to school purposes, and all moneys derived from the sale of town sites, coal and minerals, as well as all moneys found due from the United States, to be divided per capita among the citizens according to their respective rights under the treaties and agreements. * * *"

Identical written propositions were presented to the other four civilized tribes. It was a matter of common knowledge, we think, at that time that large mineral deposits, especially coal, had been opened and were being mined and sold in the territory of some of the tribes, but none had been found and developed in the territory of the Seminole Nation. Both counsel say that oil and gas was not discovered there in commercial quantities until more than twenty-five years thereafter. We think it too plain for argument that the proposition submitted was not to reserve coal and mineral under all tribal lands, but only to reserve from allotment lands on which coal and mineral had been or might be discovered before the allotments were to be made. Known mineral lands were not to be allotted between the members of the tribe. Those lands were to be sold, as the proposition expressly stated, and the moneys therefrom divided per capita.

The first Choctaw-Chickasaw Agreement, ratified three days prior to the ratification of the Seminole Agreement, is also cited to support the claimed policy of the United States. That agreement expressly provided that all coal and asphalt in and under allotments should be reserved and excepted from the allotments. Act June 28, 1898, § 29 (30 Stat. 505). However, this was changed by Supplemental Agreement made July 1, 1902 (32 Stat. 641) which, of course, was after the

546

Seminole Agreement, wherein it was provided that the Secretary of the Interior should ascertain, so far as practical, what lands of those tribes were principally valuable because of the deposits of coal and asphalt; that such lands should be segregated and later sold, and the proceeds deposited in the Treasury of the United States to the credit of the tribe; and that "All coal and asphalt deposits, as well as other minerals which may be found in any lands not so segregated and reserved, shall be deemed a part of the land and shall pass to the allottee or other person who may lawfully acquire title to such lands." 32 Stat. 654. Reference is also made to agreements with the other two tribes. They were both made after the agreement with the Seminoles, and both the Creek and Cherokee Agreements (31 Stat. 861, 32 Stat. 500, 716) made no reservation of minerals under allotments. Each of them clearly indicates that the allottee was to take the fee title.

These contentions, singly and collectively and in connection with the Curtis Act (30 Stat. 495) and the claim that the Indians understood that "land" meant only the surface, are relied on in support of the claim that under the Seminole Agreement the mineral in the allotments was not to pass to the allottee. In fact, there are attached to the bill affidavits of a large number of Seminole Indians wherein they say that the written proposition submitted to the Seminoles in 1894 by the Dawes Commission was that they should allot their lands reserving coal and mineral from allotment; that in 1897 that Commission drew up an agreement for the Seminoles to carry out these purposes and it was explained to the Seminoles that the coal, mineral, oil, and gas were not to be allotted by that agreement but reserved to the tribe, and that no allotment should carry any title to the coal, mineral, oil, and gas to the allottee, but that the land allotted and for which deeds were promised excluded the mineral; that the Seminoles ratified the agreement with that understanding, and by the second Seminole Agreement they understood that they conveyed the undivided title to the coal, mineral, oil, and gas to their members who were living on December 31, 1899. The bill asks that the plaintiffs be allowed to call witnesses in the trial to establish by proof the facts stated in said affidavits. The bill is voluminous. It states other evidentiary facts. It reviews and discusses the Goat Case, 224 U. S. 465, 32 S. Ct. 544, 56 L. Ed. 841, the De Graffenried Case, 238 U. S. 284, 35 S. Ct. 764, 59 L. Ed. 1310, and the Moore Case (C.

C. A.) 43 F.(2d) 322. The Seminole Agreement and the supplement thereto are in simple words, plain in meaning and legal significance. It has been carried out in accordance with a common understanding of what it meant and was intended to accomplish, and we cannot now, more than thirty years after it was executed, consent that it be overthrown and thwarted in its purpose by testimony from witnesses that they thought it meant something else. U. S. v. Choctaw Nation et al., 179 U. S. 494, 531, 532, 533, 534, 21 S. Ct. 149, 45 L. Ed. 291. We are unable to accept as sound any of appellants' contentions supra. The five tribes were neighbors, there were intermarriages and changes of residence from the territory of one tribe to that of another—especially so between Creeks and Seminoles—, and their several agreements bespeak a common wish and intention that the members of each should take titles as allottees in fee simple.

We gave careful consideration to the Seminole Agreement (30 Stat. 567) in Moore v. Carter Oil Co. and reached the conclusion, for the reasons there stated, that Seminole allottees acquired full equitable title to their allotments when they were made, and that thereafter when they received deeds for them, which the agreement promised and said they should have, they thus acquired, as the agreement intended they should acquire, legal title in fee to said allotments, free from any claim on the part of the tribe as such or on the part of any other member of said tribe, his heirs or grantees; and we adhere to that conclusion. We see nothing whatever in the Supplemental Agreement with the Seminoles which says that the tribe as such then claimed any interest whatever or had reserved any interest whatever in Seminole lands after they should be allotted, or that it was then disposing of any interest in said lands reserved to it to the enrolled members thereof as tenants in common. There are only two paragraphs or sections in that supplement, and the sole purpose of the first seems to be the fixing of a day on which Seminole rolls shall be closed for purposes of allotment. It provides that the Commission "shall place on said rolls the names of all children born to Seminole citizens up to and including the 31st day of December, 1899, and the names of all Seminole citizens then living." And the second section seems to have no other purpose than to fix the line of descent of Seminoles who die after that day. There are no words of conveyance, present or future, or about titles of allottees. Those matters are

all dealt with in the Seminole Agreement of July 1, 1898.

The order of the trial court dismissing the bill is therefore affirmed.