The SEMINOLE NATION OF
OKLAHOMA

v.

The UNITED STATES.

Appeal No. 4–73.

United States Court of Claims.

June 19, 1974.

Paul M. Niebell, Washington, D.C., attorney of record, for appellant.

Bernard J. Rothbaum, Jr., Washington, D.C., with whom was Asst. Atty. Gen., Wallace H. Johnson, for appellee.

Before DAVIS, NICHOLS and BENNETT, Judges.

BENNETT, Judge:

Appellant, the Seminole Nation, appeals from a May 31, 1972 Indian Claims Commission decision[1] vacating a favorable June 24, 1966 order[2] and dismissing appellant's petition. For reasons which we shall hereafter set out, we affirm the 1972 decision of the Indian Claims Commission.

Appellant brought its original complaint before the Indian Claims Commission on August 6, 1951, seeking judgment for the actual loss it incurred because of the alleged wrongful action of the United States in divesting the Seminole Nation of a one-half interest in the royalties on all minerals recovered from the area encompassed within the former Seminole Reservation established by the Treaty of March 21, 1866.[3] Appellant contended that its tribal right to receive such royalties was reserved under the express terms of the Seminole Agreement between the United States and the Seminole Nation, ratified by Act of July 1, 1898.[4]

Appellant, whose ancestral home was in Florida, was forced to migrate west of the Mississippi into what is now Oklahoma following a war with the United States. As a result of the Treaty of March 21, 1866,[5] appellant held its Indian Territory lands in fee simple.[6] By 1882, appellant owned approximately 365,000 acres of Indian Territory.[7]

In 1893, Congress changed its position with regard to appellant and four other tribes, the Cherokees, Creeks, Choctaws, and Chickasaws, all known collectively as the Five Civilized Tribes, and created the Dawes Commission.[8] It was the assigned duty of this commission to negotiate agreements with the Five Civilized Tribes for allotment and division of their tribal lands among tribe members "to enable the ultimate creation of a State or States of the Union which shall embrace the lands within said India [sic] Territory."[9]

1. 28 Ind.Cl.Comm. 117 (1972).

2. 17 Ind.Cl.Comm. 67 (1966).

3. 14 Stat. 755 (1866).

4. Ch. 542, 30 Stat. 567 (1898).

5. 14 Stat. 755 (1866).

6. Appellant acquired an additional area of 175,000 acres east and contiguous to its original tract under the Act of Aug. 5, 1882, ch. 390, 22 Stat. 257, 265.

7. Seminole Nation v. United States, 102 Ct. Cl. 565, 589–592, 617–624, 632 (1944), cert. denied, 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426 (1945); Creek Nation v. United States, 93 Ct.Cl. 561 (1941).

8. Act of March 3, 1893, ch. 209, § 16, 27 Stat. 645.

9. Ch. 209, § 16, 27 Stat. 645 (1893).

The Dawes Commission was not immediately successful in securing agreements with the Five Civilized Tribes. After considerable haggling, the agreement between the commission and the Seminoles was entered into in 1897 and approved by Congress on July 1, 1898.[10] The agreement, in pertinent part, provided as follows:

All lands belonging to the Seminole tribe of Indians shall be divided into three classes, designated as first, second, and third class; the first class to be appraised at five dollars, the second class at two dollars and fifty cents, and the third class at one dollar and twenty-five cents per acre, and the same shall be divided among the members of the tribe so that each shall have an equal share thereof in value, so far as may be, the location and fertility of the soil considered; giving to each the right to select his allotment so as to include any improvements thereon, owned by him at the time; and each allottee shall have the sole right of occupancy of the land so allotted to him, during the existence of the present tribal government, and until the members of said tribe shall have become citizens of the United States. Such allotments shall be made under the direction and supervision of the Commission to the Five Civilized Tribes in connection with a representative appointed by the tribal government; and the chairman of said Commission shall execute and deliver to each allottee a certificate describing therein the land allotted to him.

\* \* \* \* \* \*

No lease of any coal, mineral, coal oil, or natural gas within said Nation shall be valid unless made with the tribal government, by and with the consent of the allottee and approved by the Secretary of the Interior.

Should there be discovered on any allotment any coal, mineral, coal oil, or natural gas, and the same should be operated so as to produce royalty, one-half of such royalty shall be paid to such allottee and the remaining half into the tribal treasury until extinguishment of tribal government, and the latter shall be used for the purpose of equalizing the value of allotments; and if the same be insufficient therefor, any other funds belonging to the tribe, upon extinguishment of tribal government, may be used for such purpose, so that each allotment may be made equal in value as aforesaid.

\* \* \* \* \* \*

When the tribal government shall cease to exist the principal chief last elected by said tribe shall execute under his hand and the seal of the Nation, and deliver to each allottee a deed conveying to him all the right, title, and interest of the said Nation and the members thereof in and to the lands so allotted to him, and the Secretary of the Interior shall approve such deed, and the same shall thereupon operate as relinquishment of the right, title, and interest of the United States in and to the land embraced in said conveyance, and as a guarantee by the United States of the title of said lands to the allottee; and the acceptance of such deed by the allottee shall be a relinquishment of his title to and interest in all other lands belonging to the tribe, except such as may have been excepted from allotment and held in common for other purposes. Each allottee shall designate one tract of forty acres, which shall, by the terms of the deed, be made inalienable and nontaxable as a homestead in perpetuity.

All moneys belonging to the Seminoles remaining after equalizing the value of allotments as herein provided and reserving said sum of five hundred thousand dollars for school fund shall be paid per capita to the members of said tribe in three equal installments, the first to be made as

soon as convenient after allotment and extinguishment of tribal government, and the others at one and two years, respectively. Such payments shall be made by a person appointed by the Secretary of the Interior, who shall prescribe the amount of and approve the bond to be given by such person; and strict account shall be given to the Secretary of the Interior for such disbursements. [30 Stat. 567–568.]

As appears evident, from the terms of the agreement, the parties went to great lengths to insure that the allotments to individual Indians would be as equal as possible. Lands known to contain mineral deposits were not allotted to tribe members. These lands instead were leased or sold to private entrepreneurs and the proceeds from such sales were paid into the tribal treasury for eventual per capita distribution. *Cf.* Seminole Nation v. United States, 102 Ct.Cl. 565, 628 (1944), cert. denied, 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426 (1945); Fish v. Wise, 52 F.2d 544, 545 (10th Cir. 1931), cert. denied, 284 U.S. 688, 52 S.Ct. 265, 76 L.Ed. 581 (1932). Special provision also was made for minerals discovered on allotted lands after allotment and before extinguishment of the tribal government. One-half of the royalties received from the recovery of such minerals was to be paid to the tribal treasury to be used to equalize the value of the allotments, and later, upon extinguishment of the tribal government, for a school fund ($500,000). Whatever remained after establishment of the school fund was to be paid out *per capita* to members of the tribe in three equal installments.

Deeds in fee simple were to issue to the allottees "when the tribal government * * * cease[d] to exist * * *." By statute, this date was first set for March 4, 1906.[11] On March 2, 1906, however, Congress enacted a joint resolution extending the existence of the Five Civilized Tribes:[12]

* * * the tribal existence and present tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes or nations of Indians in the Indian Territory are hereby continued in full force and effect for all purposes under existing laws until all property of such tribes, or the proceeds thereof, shall be distributed among the individual members of said tribes unless hereafter otherwise provided by law.

Determination to extend the tribal government indefinitely required that some provision be made for final conveyances of allotment deeds. This was done by the Act of April 26, 1906, which provided for the execution of deeds "prior to the time when the Seminole government shall cease to exist."[13] This implemented the intent of the 1898 Agreement.

Thereafter, on May 27, 1908, Congress passed legislation "[f]or the removal of restrictions from part of the lands of allottees of the Five Civilized Tribes, * * *."[14] Section 11 of this Act spoke to the one-half portion of mineral royalties reserved to the Seminole tribal treasury by the 1898 Agreement:[15]

*Sec.* 11. That all royalties arising on and after July first, nineteen hundred and eight, from mineral leases of allotted Seminole lands heretofore or hereafter made, which are subject to the supervision of the Secretary of the Interior, shall be paid to the United States Indian agent, Union Agency, for the benefit of the Indian lessor or his proper representative to whom such royalties shall thereafter belong; and no such lease shall be made after said date except with the allottee or owner of the land: *Provided*, That the interest of the Seminole Nation in leases or royalties arising thereunder

11. Act of March 3, 1903, ch. 994, § 8, 32 Stat. 1008.

12. Res. 7 of March 2, 1906, 34 Stat. 822.

13. Ch. 1876, § 6, 34 Stat. 139 (1906).

14. Act of May 27, 1908, ch. 199, 35 Stat. 312; hereinafter sometimes the 1908 Act.

15. Ch. 199, § 11, 35 Stat. 316 (1908).

on all allotted lands shall cease on June thirtieth, nineteen hundred and eight.

Thus, though the tribal government continued to exist for some purposes, the Act of 1908 terminated the tribe's one-half interest in mineral royalties and vested that property right in the owners of the fee. As such, the 1908 Act was consistent with the purpose of the 1898 Agreement—to transfer Indian territory land in fee to individual Indian allottees in preparation for statehood.

Appellant disagrees with this analysis. It bases its claim on its interpretation of the legislative history here involved and the aforementioned 1966 order of the Indian Claims Commission. Appellant's claim is that the 1898 Seminole Agreement, while allotting the surface of the Seminole tribal domain to the enrolled tribe members, and giving each allottee a one-half interest in the minerals under his allotment, reserved one-half of the royalties on all minerals recovered from the allotted lands to the Seminole Nation as long as that nation remained in existence. Appellant argues that the United States assumed full administrative control over the Seminole Nation by terms of the 1898 Agreement and consequently was under a duty to manage and protect tribal property, including the one-half interest in the mineral royalties. Appellant maintains that the Seminole tribal government was extended by the Act of March 2, 1906, and that such extension, never having been revoked, is controlling here. Appellant dismisses the 1908 Act and its language terminating the tribal right to one-half the mineral royalties as an act passed in violation of the "fair and honorable" dealings clause—section 2, clause 5, of the Indian Claims Commission Act of 1946.[16] Such contention, appellant asserts, is supported by the 1966 Indian Claims Commission order in this case.[17]

Appellant timely filed a petition before the Indian Claims Commission on August 6, 1951. The matter thereafter proceeded in due course to a trial on the merits. On June 24, 1966, the Indian Claims Commission issued an opinion and findings in appellant's favor.[18] The commissioner's decision was critical of the efforts of the Commissioner of Indian Affairs with respect to the inclusion of section 11 in the 1908 Act. As the commission found:

> \* \* \* the Commissioner of Indian Affairs did not advance the entire Section 11 as whole before the Senate Committee on Indian Affairs, but offered the proviso separately and surreptitiously at a stage in the proceedings where no minutes were being maintained and where consequent debate was unlikely. And finally, the section and proviso were apparently offered as a mere correction of a minor inconsistency and not as a major and far-reaching unilateral change in an existing agreement or treaty statute. [17 Ind.Cl.Comm. at 74.]

The commission absolved the Dawes Commission of culpability because it could not have known that Seminole land allotments had oil or gas deposits which were not found in commercial quantities until more than 25 years later. Fish v. Wise, *supra*, 52 F.2d at 545. But, it held that the acts of the Commissioner of Indian Affairs in persuading Congress to accept section 11, *supra*, "were inconsistent with the concept of fair and honorable dealings contemplated by Clause 5 of Section 2 of the Indian Claims Commission Act of 1946." 17 Ind.Cl.Comm. at 75. The commission did not rule on some other issues raised in the case such as whether it was a tribal claim, or whether the 1908 statute was inconsistent with the Seminole Agreement of 1898. The 1966 decision emphasized that no "theory of recovery or of computation of damages has been urged by the plaintiff to date. Hence, the commission must proceed on the assumption that if a justiciable controversy exists,

---

16. 25 U.S.C. § 70a; ch. 959, § 2, 60 Stat. 1050 (1946).

17. 17 Ind.Cl.Comm. 67 (1966).

18. *Id.*

the plaintiff will undertake to establish a viable theory of recovery and measure of damages at some future date." 17 Ind.Cl.Comm. at 82–83. A hearing was ordered on the issue of damages claimed to have been suffered as a result of actions of the Commissioner of Indian Affairs and Congress in connection with enactment of the 1908 public law.

At the hearing on damages on March 10, 1969, appellant presented evidence on the actual value of one-half of the oil and gas royalties allegedly due from 1923 to 1968, but previously paid to individual Seminole allottees or their transferees pursuant to public law. The claimed sums were said to exceed 95 million dollars. Appellee objected to such evidence on grounds of relevancy and materiality. Since appellant offered no evidence relating to the May 27, 1908 value of the property. appellee filed a motion to dismiss on the ground that appellant had failed to show any actual damages as of the date of alleged deprivation. This motion was denied and appellee was ordered to file requested findings of fact, objections and briefs on the issue of damages. Appellee complied with this order on January 12, 1972, under protest, and appellant thereafter filed a reply brief on January 26, 1972.

In examining the question of damages, the commission reconsidered the entire record in this case and the issues raised but not decided in 1966, and ultimately issued a decision reversing its 1966 holding and dismissing the petition.[19] Appellant is now before this court appealing the May 31, 1972 order vacating the opinion, findings and interlocutory order of June 24, 1966, which had been in appellant's favor.

In its 1972 decision, the commission met, head-on, the fundamental issues avoided in 1966 and concluded that "no compensable property right [was] created and vested in the Seminole Nation pursuant to the Seminole Agreement of 1898." 28 Ind.Cl.Comm. at 123. It was decided that to have had any vested trib-al interest in the mineral royalties would have been contrary to the ultimate purpose of the 1898 Act—division and allotment. The equalization fund established in the 1898 Agreement was created for a limited period of time for the purpose of insuring that the allotment would be as equal as possible for individual Seminole allottees. From the conclusion that appellant had no compensable property right created in 1898, it was reasoned that none existed which could have been divested in 1908. With respect to the actions of the Commissioner of Indian Affairs, the prevailing opinion held that he had not been involved in any "improper conduct" and that he had merely been acting in his "ministerial capacity" to carry out what had been intended by the 1898 Seminole Agreement and that the evidence did not support the 1966 findings to the contrary. As to section 11 of the 1908 Act, it was said to be simply to clarify the payment of royalties and the Government derived no benefit from it. It was further found that nothing in connection with the passage of the 1908 Act could give rise to a cause of action under section 2, clause 5, of the Indian Claims Commission Act. The prevailing opinion said "[e]very effort was made to provide for allotments which were equal in value. Further, any failure to allot each member a mathematically equal share would merely affect the personal property interests of the individual Seminole allottees. Such individual claims are beyond this Commission's jurisdiction, * * *." 28 Ind.Cl.Comm. at 128. Finally, the commission rejected the notion that the Dawes Commission had acted wrongfully in dividing the Seminole lands by value without taking into account the value of the latent oil deposits within some allotments. "The Dawes Commission could not have known that any of the allotments included oil deposits." 28 Ind.Cl.Comm. at 128.

Pursuant to its decision, the commission vacated its previous findings and

19. 28 Ind.Cl.Comm. 117 (1972).

opinion and dismissed appellant's petition.

The commission's decision was not unanimous. One commissioner concurred in the result on account of appellant's failure to prove damages as of 1908. Two commissioners dissented from the commission's decision. It was their opinion that the 1966 findings of fact and opinion were proper and justified and should not be set aside. Appellant's motion for rehearing was denied by the commission on January 26, 1973.

Appellant thereafter filed an appeal in this court criticizing the factual determinations made by the commission in its 1972 opinion, contending that the commission had used technical legal principles to reject a valid "fair and honorable dealings" claim and asserting that the 1898 Seminole Agreement gave the Seminole Nation a vested interest in one-half of the mineral royalties taken from allotted lands, that the 1908 Act was not passed in good faith, and that its proof of actual damages suffered by the Seminole Nation was not erroneous since such damages were a direct consequence of appellee's wrongful act.[20]

Appellee responded to appellant's claims, contending that it was this court's duty to consider only whether the 1972 commission decision was supported by substantial evidence and was in accord with applicable law. For reasons which follow, we agree with appellee and hold that the May 31, 1972 decision of the Indian Claims Commission was correct.

In the first place, this court has held in Confederated Tribes of Warm Springs Reservation v. United States, 177 Ct.Cl. 184 (1966), that an administrative tribunal has the right to vacate a previous judgment and enter a new decision as long as such a matter is still within the ken of the agency's jurisdiction and it acts within a reasonable time on a rational basis. In *Warm Springs,* the commission issued an order favorable to appellants on June 10, 1960. Appellee thereafter filed a motion for rehearing which was denied on October 10, 1963. At the same time it denied the motion for rehearing, however, the commission set aside its 1960 findings and order and entered a new order, together with new findings of fact and conclusions of law. As in the present case, the new order was less favorable to appellant than the original order. In support of its decision, this court quoted language from Shein v. United States, 102 F.Supp. 320, 323 (1951), aff'd, 343 U.S. 944, 72 S.Ct. 1043, 96 L.Ed. 1349 (1952):

> \* \* \* "If upon deeper research, fuller reflection and consideration, the judicial or quasi-judicial body would see a mistake but persist in it, this would amount to mere obstinacy or stubbornness and foster the highest form of injustice." [177 Ct.Cl. at 192.]

In *Shein,* the Interstate Commerce Commission, acting on a motion for reconsideration by an intervenor and without taking any new evidence, reconsidered and revised an earlier holding.

In *Warm Springs,* this court viewed its function as one of determining whether there had been an abuse of discretion or a failure to exercise discretion on the part of the administrative body. The court held that once a rational basis for the revised opinion had been found, the reviewing function of this court ended. 177 Ct.Cl. at 192. Once the original order had been vacated by the subsequent order, the original order became legally "nonexistent" and "not subject to appeal." 177 Ct.Cl. at 193.

The analysis employed in *Warm Springs* is supported by our recent opinion in Gila River Pima-Maricopa Indian Community v. United States, 494 F.2d 1386, 1393, 204 Ct.Cl. ——, ——.

> \* \* \* As the expert in this field charged with primary responsibility,

---

20. Appellant has argued that the appeal presents 13 questions for review. We consider those necessary for deciding the appeal.

the Commission is the tribunal to exercise this discretion; all the court can or should do is to oversee and keep it within rational bounds. *Cf.* The Snake or Piute Indians v. United States, 112 F.Supp. 543, 125 Ct.Cl. 241, 254–255 (1953).

■ In reviewing the May 31, 1972 commission decision, this court must look to the manner in which that body exercised the discretion granted it in the Indian Claims Commission Act of 1946.[21] As soon as a rational basis can be found for the commission's decision, this court's reviewing function is complete. For purposes of our consideration, the 1966 order of the Indian Claims Commission shall have no force or effect. It is a nullity.

■ In the first part of its brief to the court, appellant has attempted to have this court retry factual matters already determined by the commission in its 1972 findings of fact and prevailing opinion. Appellant bases its argument, to a large extent, on the 1966 opinion in this case, a decision which we have ruled to be "nonexistent" for purposes of our analysis here. Since only the 1972 opinion is presently before the court and since we agree with the commission's conclusion that the Commissioner of Indian Affairs was acting in his ministerial capacity in carrying out the purpose of the 1898 Seminole Agreement when he caused the aforementioned section 11 to be included in the Act of May 27, 1908, we must reject appellant's argument that the majority of the commission erred in failing to find essential facts necessary for the proper determination of this case. What appellant has really requested this court to do is to reweigh, de novo, the evidence presented to the commission. Such action would not be proper. 25 U.S.C. § 70s(b) provides in part:

* * * On said appeal the Court shall determine whether the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law, including any conclusions respecting "fair and honorable dealings", where applicable, * * * are valid and supported by the Commission's findings of fact.

With respect to this statutory provision, the court has indicated that—

* * * our responsibility ends when we are satisfied that the findings of the Indian Claims Commission are supported by substantial evidence. That we might have reached a contrary result on the evidence introduced is not the test. * * *. [United States v. Seminole Nation, 173 F.Supp. 784, 790, 146 Ct.Cl. 171, 180 (1959). Cf. Lummi Tribe v. United States, 181 Ct.Cl. 753, 757 (1967).]

Since we are convinced that the commission had a rational basis for concluding that the 1908 legislation was a necessary evolution of the 1898 Seminole Agreement, we must reject appellant's contentions.

■ Appellant's argument that this court should not employ technical legal principles to reject a moral claim based upon "fair and honorable dealings" must also be rejected since appellant has no "moral claim" here. Whatever "moral claim" appellant might have had in this matter went by the board when the commission vacated its 1966 judgment concerning a violation of the "fair and honorable dealings" clause of the Indian Claims Commission Act of 1946. Since the prevailing opinion of May 31, 1972, now before the court, states there was no violation of the "fair and honorable dealings" clause— and that conclusion is based on substantial evidence—and is correct—appellant's argument must be rejected. As has been noted in other opinions of this court, the Indian Claims Commission Act is not a "catchall" for all deprivation—physical, psychological,

21. 25 U.S.C. § 70 et seq., ch. 959, 60 Stat. 1049 (1946).

social, economic and cultural—visited upon the Indian people as a result of the actions of the United States. Rather, the act is a "synthesis of those ' * * * classes of cases * * * which * * * heretofore received congressional consideration in the form of special jurisdictional acts." Gila River Pima-Maricopa Indian Community v. United States, 427 F.2d 1194, 1200, 190 Ct.Cl. 790, 801, cert. denied, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970).

Appellant contends that by the terms of the 1898 Seminole Agreement, the Seminole Nation received a vested interest in a one-half portion of the mineral royalties recovered from Seminole tribal lands and that such interest could not be arbitrarily abrogated by the 1908 statute. *Cf.* Choate v. Trapp, 224 U.S. 665, 674, 32 S.Ct. 565, 56 L.Ed. 941 (1912). Such an argument is incorrect *ab initio.* In Choate v. Trapp, the Supreme Court considered the tax exempt status of property allotted to individual Indians pursuant to the Atoka Agreement negotiated between the Dawes Commission and two of the Five Civilized Tribes in 1897 and approved by Congress as part of the Curtis Act on June 28, 1898.[22] The Court ruled that Congress could not, by statute, lift the tax exemption without engaging in a taking barred by the Fifth Amendment. In the instant case, the Seminole Nation was impressed only with the duty to maintain royalty funds until such could be paid to individual Seminole allottees. No vested right, similar to the tax exemption granted as part of the Atoka Agreement, accrued to the Seminole Nation as part of the 1898 Seminole Agreement. The 1898 Agreement established only an "equalization fund" to provide a means by which allotments made to individual Indians could be equalized as to value. As such, the Seminole Nation served only as a temporary stakeholder with respect to the interests of its member-allottees. In the 1908 legislation, Congress indicated that the purpose of

having such a temporary stakeholder had been satisfied and that such funds as had formerly been turned over to the Seminole Nation for allotment equalization should thereafter be paid direct to the individual allottees.

Our conclusion in this instance is supported by the Tenth Circuit's opinion in Moore v. Carter Oil Co., 43 F.2d 322 (10th Cir. 1930), cert. denied, 282 U.S. 903, 51 S.Ct. 216, 75 L.Ed. 795 (1931), wherein that court considered the same provisions of the 1898 Agreement and the 1908 Act as are here involved.

> * * * The inference that the allottee should receive all of the royalty on the expiration of the *temporary* period is unavoidable; else what purpose can be attributed to the * * * paragraph, which gave the allottee a right to title in fee at the expiration of the *temporary period* and debars the Nation and all its other members of any right, title or interest therein.

> * * * Later Congress passed the Act of May 27, 1908 (35 Stat. 312), in the eleventh section of which it expressed in substance its finding that the special purpose of paying one-half of the royalties under mineral leases into the tribal treasury had been accomplished, * * *. [Emphasis supplied. 43 F.2d at 325.]

*Cf.* Goat v. United States, 224 U.S. 458, 32 S.Ct. 544, 56 L.Ed. 841 (1912); Fish v. Wise, *supra.*

Congress consequently declared, in section 11, that the Seminole Nation's interest in the leases or the royalties arising under the leases would be terminated as of June 30, 1908, directed that royalties arising thereafter go directly to the allottees of the land or their proper representatives, and ordered that no such lease should be made after June 30, 1908, except with the allottee or owner of a particular allotment. Ch. 199, § 11, 35 Stat. 316; 43 F.2d at 325.

22. Ch. 517, 30 Stat. 505 (1898).

Indeed, the Indian Claims Commission reached an identical conclusion in its consideration of appellant's claim:

> The Seminole equalization fund was created for the special purpose of equalizing the value of the allotments. And the payments of one-half of the royalties from allotted lands were to cease when the conveyances were made to the allottees. * * *. It is clear from the negotiations and the agreement itself, particularly those provisions requiring per capita payments of all remaining tribal funds, that the intent of all the parties was that all property interest would vest in the allottees and that the allottees would in return relinquish any interest in other tribal lands. To have vested any mineral estate in the tribe would have been contrary to the manifest intent ·of dissolving the tribal government and ending the communal system of land ownership. [28 Ind. Cl.Comm. at 123–24.]

Appellant's attempt to distinguish *Moore* by reason of the fact that it was decided prior to passage of the Indian Claims Commission Act is without merit. The court in *Moore* determined the effect of the 1898 Seminole Agreement and subsequent legislation regarding the one-half portion of mineral royalties. Absent a determination of a violation of the "fair and honorable dealings" clause, the applicability of *Moore* was in no way affected by passage of the Indian Claims Commission Act.

■ Appellant's reliance on the commission's 1966 decision is misplaced. This court has only the obligation to review the 1972 commission decision under standards already enunciated in this opinion. Suquamish Tribe v. United States, 197 Ct.Cl. 775 (1972). Our review of the 1972 opinion convinces us that it was rationally concluded that the Commissioner of Indian Affairs acted pursuant to the ministerial powers granted him in the 1898 Agreement when he sought to obtain passage of the 1908 legislation. This conclusion represents no abuse of discretion.

Even if this court had found that appellant's rights had been violated, it would not be possible for this court to determine that any damages were actually due the Seminole Nation as a result of defendant's actions. Appellant was acting as a mere stakeholder under the 1898 Seminole Agreement. That agreement directed that the one-half-the-royalties fund paid to appellant—

> * * * *shall be used* for the purpose of equalizing the value of allotments;
>
> * * * * *
>
> All moneys belonging to the Seminoles remaining after equalizing the value of allotments as herein provided and reserving said sum of five hundred thousand dollars for school fund *shall be paid* per capita to the members of said tribe in three equal installments, * * *. [Ch. 542, 30 Stat. 567–568 (1898). Emphasis supplied.]

In effect the agreement established an express trust with the tribal government as trustee and the individual allottees as beneficiaries. No rights vested in the tribal government, only duties. Appellant, in its own right, had no independent property interest redressable in this court. It was required to distribute all royalties which it received. The effect of the 1908 legislation was to terminate the equalization fund and cause a final distribution of the corpus, as provided above. The appellee created the trust and in the exercise of proper discretion could and did terminate it on whatever grounds would best serve the beneficiaries. It was not an irrevocable trust, and appellant was not a beneficiary of it.

■ As our determinations thus far have indicated, the Act of May 27, 1908, was simply an implementing statute designed to carry into effect the purpose of the 1898 Seminole Agreement, accord-

ing to its express terms. Congress and the Commissioner of Indian Affairs acted in good faith in terminating the equalization fund. Their actions in no way violated the "fair and honorable dealings" provision of the Indian Claims Commission Act of 1946. On the contrary, their actions were designed to make it possible for the individual Seminole allottees to receive all the royalties just as had been done for the Indians of the other four Civilized Tribes. The 1898 Agreement with the Seminoles had differed from arrangements with the other tribes in that particular. This is the explanation given to the Secretary of the Interior in his 1908 report by the Commissioner of Indian Affairs describing the purpose of section 11 of the 1908 Act. The prevailing commission opinion has rightly rejected appellant's argument and the 1966 finding that this amounted to some sort of fraud or conspiracy between the Commissioner of Indian Affairs and Congress to defraud appellants of a vested right by enactment of the 1908 law, even assuming the speculation as to the motivation of Congress in enacting a statute is a permissible subject of judicial inquiry. Appellants have cited no cases to demonstrate that the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1049, 25 U. S.C. § 70 et seq., vitiates the established rule to the contrary. Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1809). *See also* Palmer v. Thompson, 403 U.S. 217, 224–226, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); United States v. O'Brien, 391 U.S. 367, 383–385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Arizona v. California, 283 U.S. 423, 455–456, 51 S. Ct. 522, 75 L.Ed. 1154 (1931).

 In his separate concurring opinion, Commissioner Yarborough pointed out that under appellant's theory of the case, tribal property was wrongfully taken on June 30, 1908. As a result, since no vestige of any sort of tribal interest in the royalty fund remained after that date, it is necessary that appellant prove damages as of June 30, 1908. United States v. Klamath & Moadoc Tribes, 304 U.S. 119, 123–124, 58 S.Ct. 799, 82 L.Ed. 1219 (1938). *Cf.* Klamath & Modoc Tribes v. United States, 436 F.2d 1008, 1020, 93 Ct.Cl. 670, 693 (1971). In Shoshone Indians v. United States, 85 Ct.Cl. 331 (1937), aff'd, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938), a pre-1946 "moral claim" upon which Congress had specifically allowed suit, this court held that valuation must be determined on the date of the taking. This rule of law is unquestioned in taking cases and is no less viable in this claim for a breach of fair and honorable dealings predicated on an alleged taking. Since no violation of the Indian Claims Commission Act is involved, the date of the alleged taking, June 30, 1908, must be the pertinent date here. Since appellant failed to prove any damages as of this date in its hearing before the Indian Claims Commission, its claim would have to be rejected or remanded for further proof if liability were found under some theory. The dissenters address the issue of valuation with studied silence. As heretofore noted, the 1966 decision provided that "on the assumption that if a justiciable controversy exists, the plaintiff will undertake to establish a viable theory of recovery and measure of damages." The assumption of a justiciable controversy not having been established on the commission's ultimate consideration of the whole record, and no viable theory of recovery or measurement of damages having been satisfied by appellant's proof, its claim must fail.

For the reasons given, we affirm the May 31, 1972 order of the Indian Claims Commission directing that appellant's petition be dismissed.

Affirmed.